HIRAM H. HENDERSON ET AL., APPELLANTS, *v.* LOUIS B. ADAMS ET AL., RESPONDENTS.

TRUST—TITLE—FINDING OF FACT—FRAUD.

1. Louis B. Adams and Watson N. Schilling contracted a debt to Edward A. Reed, which the plaintiffs, as his administrators, on June 30, 1892, commenced suit to recover, and in which they obtained judgment on July 21, 1894, for $3,520. On August 31, 1893, Adams was indebted to the National Bank of Ogden in the sum of $24,602, to Wells, Fargo & Co. in the sum of $10,000, and to John E. Dooly in the sum of $10,000, all of which sums were secured in part by certain bank stocks. To secure these creditors further, Adams and others, as nominal stockholders, organized a nursery company, and property, real and personal, belonging to Adams, was contributed as stock, in order that the stock certificates might be issued to increase the securities on the debts due the bank, Wells, Fargo & Co., and Mr. Dooly. The land to be thus converted into stocks of the corporation was conveyed to Brastow in trust for the nursery company, to be by him transferred to the company. The entire transaction was found to have been made in good faith. *Held*, that the trust deed was a passive or naked one, and that it is a part of the common law of the state that the legal title to the land described in the trust deed to Brastow passed to the nursery company, as *cestui que* trust, when its organization was perfected.

2. While the statute of uses never became a part of the English common law, and has never been adopted by the legislature of this state, the rule of law that vests a passive or naked trust in the person having the use is a part of the common law of this state.

3. The finding of fact by a trial court will not be set aside

without finding that it was made against the clear preponderance of the evidence.

4. The fact that the security thus given the bank' and others might delay the collection of plaintiff's judgment does not render the security newly given fraudulent, as the stock can be reached on execution as readily as the land transferred could have been.

5. The bank may hold the property, by means of the corporation and its stock, as security for the debt, a reasonable time, but it cannot hold it for the use and benefit of Adams; and, if it should be made to appear that the bank is so doing, the property should be taken out of his hands, and placed in the hands of a receiver, and subjected to the payment of his debts.

(No. 771.   Decided March 7, 1897.)

Appeal from the Second district court, Weber county. Hon. C. H. Hart, *Judge.*

Action by Hiram H. Henderson and George H. Burgitt as administrators of the estate of Edward A. Reed against Louis B. Adams and others, asking that a certain trust deed be set aside, that a receiver be appointed, that defendants account for all property received by them, and that the receiver be directed to sell the property received by him or so much as may be necessary to pay a judgment held by plaintiffs against Louis B. Adams et al. Judgment for defendants.   Plaintiffs appeal.   *Affirmed.*

The court below found that on March 27, 1890, defendant Louis B. Adams and one Watson Schilling contracted a debt to Edward A. Reed, which the plaintiffs, as his administrators, on June 30, 1892, commenced a suit to recover, and in which they obtained a judgment on July 21, 1894, for $3,520, and that on August 31, 1893, Adams was indebted to the Utah National Bank of Ogden in the sum of $24,602.37, for which the bank held as security

40 shares of its stock, owned by him; that he was also indebted to Wells, Fargo & Co. in the sum of $10,000, as security for which that company held stock issued by the same bank of the value of $8,250; and that he was indebted to John E. Dooly in the sum of $10,000, for which he held as security stock in the same bank of the value of $6,000. The court further found that Mr. Dooly was the president of the Utah National Bank, and agent of Wells, Fargo & Co.; that the indebtedness to the bank was due, and Adams wanted further time, and proposed to give real and personal property as security, estimated to be worth $60,000, though of less market value; that he wished it sold in parcels from time to time, thinking more could be realized for it in that way; that Adams and Dooly took legal advice, and were informed that a corporation could be formed to which the property might be transferred, and that the stock issued could be transferred to the bank as security; that the method suggested was agreed to, and, to accomplish it, Adams associated with him William F. Adams, Edward M. Allison, Louisa M. Adams, and Sarah Walker, who united with the owner and debtor, Louis B. Adams, in a deed conveying the property to George B. Brastow in trust for the corporation, to be named the Adams Nursery Company. It further appears from the findings that on the same day the corporation was formed for the purposes, as alleged in its articles, of conducting the business of a nursery, and selling, leasing, exchanging, improving, mortgaging, and acquiring real estate within the county of Weber, in the state of Utah; that its capital stock was $100,000, divided into 1,000 shares of $100 each, of which 994 shares were issued to Louis B. Adams and 1 share to each of the other incorporators; that Adams on the next day assigned 900 of the shares to the bank as a pledge and security for the

debt due from him, and the remaining 94 shares to Wells, Fargo & Co. and John E. Dooly, as security for the debts due them. The court further found that the entire transaction was made in good faith, without any intent to hinder, delay, or defraud creditors, and for the sole purpose of securing the just debts of said Adams to said creditors. The first proviso of section 2268, 2 Comp. Laws Utah, is as follows: "Provided, that where the amount of the capital stock of any corporation which may be formed under the provisions of this act consists of the aggregate valuation of property, for the working, development, management, use, sale or exchange, of which such corporation shall be formed, no actual subscription in money to the capital stock of such corporation shall be necessary; but each owner of such property shall be deemed to have subscribed such an amount to the capital stock of such corporation as under the bylaws will represent the fair estimated cash value of so much of said property, the title to which he may, by deed of trust, convey, or may have conveyed, or vested in such corporation; such subscription to be deemed to have been paid in upon the execution and delivery to such corporation of such conveyance or deed of trust."

*Richards & Macmillan* and *H. H. Henderson,* for appellants.

"Insolvency means a general inability to answer pecuniary engagements, and it does not follow that he is not insolvent because he may ultimately have a surplus after winding up his affairs." *Bank* v. *Sprague,* 21 N. J. Eq. 538; Sugden on Vendors, 668; *Bayly* v. *Scofield,* 1 Maule & S. 338; *Hall* v. *Swift,* 4 Bingham, N. C. 381; *James* v. *Scott,* 98 Am. Dec. 328.

15 UTAH—3

According to finding 18, Louis B. Adams had full control of all the property, and though a corporation had been formed, which was a *cestui que* trust, there had never been a meeting of the board of directors or of the stockholders. Where the consequences of one's acts are to hinder, or delay creditors, the law will presume that he intended his acts to produce such results. *Bank* v. *Barker*, 12 Utah 13; *Snyder* v. *Free*, 21 S. W. 847; *Belden* v. *Seymour*, 8 Conn. 304; *Houston* v. *Blackman*, 66 Ala. 559; *Goodspeed* v. *Fuller*, 46 Me. 141; *Lawson* v. *Funk*, 108 Ill. 502; *Maigley* v. *Hauer*, 7 Johns 341; *Grout* v. *Townsend*, 2 Hill 554; *Coleman* v. *Burr*, 93 N. Y. 17; 8 Am. & Eng. Enc. of Law, p. 753.

And we contend that even if the property had been transferred to the corporation itself the same rule would apply. *Bank* v. *Sprague*, 21 N. J. Eq. 539-540.

Where a corporation issues stock for property, it is not a *bona fide* purchaser of that property. 2 Cook, on Stock and Stockholders, sec. 670; *Rogers* v. *N. Y. & T. L. Co.*, 134 N. Y. 211.

"A creditor of an insolvent person may treat as void a conveyance of all his property to a corporation in exchange for its shares of stock; he may file a bill to set aside the conveyance and he may pursue the assets in the hands of the transferee." *Bank* v. *Sprague*, 21 N. Y. Eq. 538; *Terhune* v. *Skinner*, 19 At. Rep. 377; *Williams* v. *Colby*, 6 N. Y. S. 463; *Cole* v. *Mullarton Iron Co* , 13 N. Y. S. 851; *Cole* v. *Merc. Trust Co.*, 30 N. E. 847; *McVicker* v. *Amer. Opera Co.*, 40 Fed. 861; *Gardner* v. *Keogh Mfg. Co.*, 18 N. Y. S. 391; *Bank* v. *Hamilton*, 34 N. J. Eq. 158; *Ladd* v. *Wiggin*, 69 Am. Dec. 551.

*Bennett, Harkness, Howat & Bradley, E. M. Allison, J. N. Kimball,* for respondents.

The effect of preferences by a debtor to a creditor is usually to delay other creditors and oftentimes deprives payment to them, but the effect of the transaction does not render it fraudulent unless there be a motive of the parties to it to hinder and delay the other creditors. *David* v. *Schwartz,* 155 U. S. 631; *Jones* v. *Meyer,* 63 N. W. Rep. 773; *Eversman* v. *Clements,* 40 Fed. Rep. 575; *Noise* v. *Sanger,* 27 S. W. Rep. 1022; *Parlin, etc., Co.* v. *Spencer,* 33 Pac. Rep. 362; *Samuel* v. *Kittinger,* 33 Pac. Rep. 509; *Turner* v. *Iowa National Bank,* 26 Pac. Rep. 256; *First National Bank* v. *Ridenour,* 27 Pac. Rep. 150.

ZANE, C. J., after stating the case, delivered the opinion of the court.

On August 31, 1893, the defendant Louis B. Adams owed the Utah National Bank of Ogden $24,602.37, then due. The bank was willing to grant him further time for its payment, if he would give additional security. Adams executed a deed conveying certain real estate, estimated to be worth $60,000, and transferred some personal property, to one George Brastow in trust for the Adams Nursery Company, a corporation to be organized the next day to carry on the nursery and real-estate business in Weber county, Utah. It was also agreed by Adams and the bank that such real estate and personal property should be paid for by issuing the stock of the nursery company to Adams, and that he should pledge the same to the bank to secure his indebtedness to it. It appears that the stock was so issued to Adams and pledged to the bank, and that the trustee has not conveyed or transferred the property so deeded to him to the nursery company. In view of the fact that the trustee has not conveyed the land described in the trust deed to him to the Adams Nursery Company, counsel for plaintiffs insist

that the legal title thereto is still in the trustee, while counsel for the defendants contend that, in view of the nature of the trust, the law passed the title to the Adams Nursery Company as soon as its organization was perfected. To a clear understanding of the question, it is necessary to refer to the statute of uses, and to its effect upon uses and trusts and the mode of transferring the legal title to lands. The most ancient method of conveying land known to the common law is described by the term "feoffment," according to which the language used in making the transfer was attended with corporeal possession. The intention to transfer the title was expressed by appropriate physical acts as well as by appropriate words. Mere words, whether spoken or written, were not sufficient. The acts attending the preparation, signing, acknowledging, and delivery of a deed sufficient since the adoption of the statute of uses were not enough. The ceremony is known as "livery of seisin," and is described in the second book of Blackstone's Commentaries (page 315). During the existence of that system of conveyance, uses and trust were introduced to evade the statutes of mortmain, and became almost universal. A use may be defined as "the right in one person to take the profits of land of which another has the legal title and possession, with the duty of defending it and making estates thereof as directed by the *cestui que* use.' " Prior to the statutes of uses, the terms "use" and "trust" were used without any accurate distinction between them. The introduction of uses, and the development and application of the rules defining "uses" and "trusts," abounded in subtile refinements and nice distinctions. And finally the concealed operation of those, and the often unknown existence of such rights to others than the immediate parties, resulted in much uncertainty, deception, and injustice.

The statute of 27 Hen. VIII, c. 10, called the "Statute of Uses," was adopted for the purpose of sweeping the system away, and with the intent of substituting a simple method of transferring title to lands, without such opportunity for evasion and deception, and with the intent of ridding rights to real property of the secrecy and uncertainty to which they had been subject. That statute enacted that: "When any person shall be seised of lands," etc., "to the use, confidence or trust of any other person or body politic, the person or corporation entitled to the use in fee-simple, fee-tail, for life, or years, or otherwise, shall from thenceforth stand and be seised or possessed of the lands," etc., "of and in the like estates as they have in the use, trust or confidence, and that the estate of the person so seised to use shall be deemed to be in him or them that have the use in such quality, manner, form and condition, as they had before in the use." 2 Bl. Comm. 332, 333. This author adds: "The statute thus 'executes the use,' as our lawyers term it; that is, it conveys the possession to the use, and transfers the use into possession, thereby making the *cestui que* use the complete owner of the lands and tenements, as well at law as in equity." Thus, the right of possession is given to the person having the right to the use. The same author further says: "The various necessities of mankind induced also the judges very soon to depart from the rigor and simplicity of the rules of the common law, and to allow a more minute and complex construction upon conveyances to uses than others. Hence it was adjudged that the use need not always be executed the instant the conveyance is made, but, if it cannot take effect at that time, the operation of the statute may wait till the use shall arise upon some future contingency, to happen within a reasonable period of time." Following

the same rule of construction, the courts also held that
"no use could be limited on a use;" and they held that in
case of such limitation the first would be executed, and
the latter would be void. Again, they held that the
statute did not extend to terms of years. And lastly the
same author says: "(By more modern resolution) where
lands are given to one and his heirs in trust to receive
and pay over the profits to another, this use is not
executed by the statute; for the land must remain in the
trustee, to enable him to perform the trust." These three
exceptions appear to be almost all that is left of that
complicated and elaborate system of rules based so
largely upon nice distinctions and subtile reasoning to
evade the forfeitures of real property held by the church,
religious or political factions, or vanquished warriors.
This rule is laid down in 2 Washb. Real Prop. (5th Ed.)
466, 467, as follows: "In most of the United States the
statute of uses is so far recognized as the law of the state,
either by express enactment of the statute itself, or of
similar statutes, or by the decisions of the courts, that
where the use is merely dry or passive, as an estate
granted to A., to the use of B., the legal title will immedi-
ately vest in B., the *cestui;* whereas, if any active duty is
imposed upon the grantee to uses, as to collect the rents
and profits of the land and pay them to B., the statute of
uses will not transfer the legal title to the *cestui.*" And
at pages 501 and 502, Id., the following language is used:
"Although the limitation of the estate to one be such as
would be executed in another, as the *cestui que* trust, if
the trust named was to be merely passive, yet, if he have
an active duty, to do which requires him to hold the legal
estate for a term or time, he will be considered as seised
thereof accordingly, so long as it shall be necessary; and
it will be then executed in the *cestui que* trust, upon the

principle that trustees only take so much of the legal
estate as the purposes of the trust require." The reason
for livery of seisin in conveying the legal title to lands
ceased when the act for recording deeds went into effect
in this state, and a bargain and sale deed passes the legal
title to land, under the principle of the statute of uses.
Though lands may be in the adverse possession of an-
other, the owner may, by deed under the statutes of Utah,
pass his title to any third person. The statute of uses
has been adopted in some states, and in other states stat-
utes having a similar effect have been enacted; and in
others, where no such statutes exist, the principle of the
statutes of uses has been regarded as a part of the com-
mon law, and applied to deeds of conveyance, uses, and
trusts. It is true that the statute of uses was not a part
of the English common law, and has not been expressly
adopted in this state. The common law, like all human
institutions, has been subject to change. From time to
time some of its rules have been changed or rescinded by
statutory enactments, the reasons for others ceased to
exist, and the rule ceased with the reason. They were
introduced to the new conditions of this country with its
settlement, and enterprise and development have changed
those conditions since. In the application of the prin-
ciples of the common law amid such new and varying
conditions, experience and observation have brought to
light necessities for the application of new rules to be
ingrafted upon the old system. And the courts of last
resort in some of the states have declared that the com-
mon law executes a passive or naked trust, like the one
in question, and vests the legal title in the person having
the use,—the *cestui que* trust. We hold that that rule is
a part of the common law of this state, and that the title
to the land described in the trust deed to Brastow passed

to the Adams Nursery Company when its organization was perfected. *Bryan* v. *Bradley,* 16 Conn. 474; *Jackson* v. *Root,* 18 Johns. 60; *Barrett* v. *French,* 1 Conn. 354; *Ramsay* v. *Marsh,* 2 McCord 252; *Henderson* v. *Griffin,* 5 Pet. 150; 4 Kent, Comm. (13th Ed.), 299; Flint, Trusts, §§ 120, 121.

The plaintiffs, as administrators of the estate of the intestate, Reed, are the only creditors complaining of the transaction in question. They insist that the deed to Brastow, the conveyance of the real estate, the transfer of the personal property to the Utah Nursery Company, the subscription by Adams for the stock, the issuance thereof to him, and the pledging of it to the Utah National Bank, operate to hinder and delay them in the collection of the debt to the estate which they represent, and are therefore fraudulent, and they ask that the trust deed may be set aside. The seventeenth finding of fact by the court below is as follows: "That the incorporation of said Adams Nursery Company, and the conveyance to said Brastow, in trust for said Adams Nursery Company, of said real estate and personal property, and the assignment to said Utah National Bank by said Adams of 900 shares of the capital stock of said Adams Nursery Company on September 1, 1893, as a pledge and security for the debt due by said Adams to said bank, and the future pledge of said 900 shares of stock, and of the further number of ninety-four (94) shares of the capital stock of said Adams Nursery Company, as security for the debts due by said Adams to said Wells, Fargo & Co. and said John E. Dooly, were all done in good faith, without any intent on the part of any of the parties thereto for hindering, delaying, or defrauding the plaintiffs herein, or any of the creditors of said Louis B. Adams, but for the sole purpose of securing debts justly

owing from said Adams." This is a specific finding upon the issue of fraud, and, so far as fraud in fact is involved, we would not be authorized to disregard it, without finding that it was made against the clear preponderance of the evidence. Undoubtedly, the $24,602.37 was justly due the bank, and the $10,000 was justly due Wells, Fargo & Co., and a like amount was due Mr. Dooly, and the security for these several claims was inadequate before the execution of the trust deed. It is true that the property described in the trust deed was estimated to be of the value of $60,000, but its market value was found to be less; how much, is not mentioned. As security, its market value should be considered. Plaintiffs' suit had been pending about 14 months when the trust deed was given, but a judgment was not obtained until about 10 months after it was given. During its pendency the defendant Adams was authorized to secure other creditors. We may infer that the security given the bank would delay the collection of plaintiffs' judgment, but that is often the case where a debtor without property enough to secure all of his creditors secures a part of them. Such a result does not render the security given fraudulent. We may presume from the findings that Adams believed his property would bring more if sold in parcels. To accomplish that end, he organized the Adams Nursery Company, and conveyed to it, and assigned his stock to a portion of his creditors, and thereby the control of his property to them. This stock can be reached on execution as readily as the land transferred could have been. If the bank is permitting Mr. Adams to mismanage the property of the corporation, or to appropriate it or the profits or income therefrom to his own use, a receiver should be appointed, upon a proper showing. The bank has no right, through the

instrumentality of the nursery company, to allow Adams to manage its property for his own use, regardless of the rights of his creditors. The bank may hold the property, by means of the corporation and its stock, as security for the debt, a reasonable time, but it cannot hold it for the use and benefit of Adams; and, if it is made to appear that the bank is doing so, the property should be taken out of his hands, and placed in the hands of a receiver, and subjected to the payment of his debts. We are disposed to hold that Adams had the right to adopt the method he did to secure one of his creditors, and that the entire transaction was made in good faith, and that it must be upheld. We have been referred by counsel to a number of cases, but, upon an examination of them, none are found to be entirely analogous to the one in hand. The following appear to be more pertinent: *Priest* v. *Brown*, 100 Cal. 626; *Davis* v. *Schwartz*, 155 U. S. 631.

The judgment of the court below is affirmed, with costs.

BARTCH and MINER, JJ., concur.