GEORGE C. WHITMORE, Appellant, v. UTAH FUEL COMPANY, a Corporation, and RIO GRANDE WESTERN RAILWAY COMPANY, a Corporation, Respondents.

No. 1438.    (73 Pac. 764.)

1. **Waters and Water Courses: Evidence: Sufficiency.**
Evidence in a suit to enjoin defendants from taking water from certain wells, examined, and *held* to support a finding that such taking did not deprive plaintiff of any water which he had theretofore appropriated.

2. **Same: Appropriation: Wrongful Diversion.**
Known underground streams, flowing in well-defined channels, are subject to appropriation, and can not thereafter be diverted by the wrongful act of another.

3. **Same: Damages.**
Where a stream of water appropriated by plaintiff was diverted by the wrongful act of defendant, plaintiff was entitled to recover whatever damages were the proximate and direct result of the diversion, and if the entire stream was diverted, and could not be restored, plaintiff was entitled to recover the value thereof.

4. **Same: Findings: When Set Aside.**
A finding of fact by a trial court will not be set aside unless it is clearly against the preponderance of the evidence.

(Decided October 5, 1903.)

Appeal from the Seventh District Court, Carbon County.—*Hon. Jacob Johnson*, Judge.

Action to enjoin defendants from taking water from certain wells excavated by them and also from cutting off and diverting, by means of excavations, the water from an underground channel which supplied certain springs which formed a part of the source of supply of Grassy Trail creek. From a judgment in favor of the defendants, the plaintiff appealed.

AFFIRMED IN PART:   REVERSED IN PART.

*Messrs. Brown & Henderson* for appellant.

*Messrs. Sutherland, Van Cott & Allison* and *Andrew Howat, Esq.,* for respondents.

We think the following are correct statements of the law applicable in controversies of this character: (1) That a stream of water running upon the surface of the ground cannot be interfered with by diversion of the water from the channel on the surface of the ground. (2) That where an underground stream flows in a well-defined channel with well-defined bed and banks, and the existence of which may be known to a person of ordinary observation, the rule stated in division one hereof applies, and water therefrom may not be diverted to the detriment of another. (3) That if the existence of the underground stream is not open to the observation of an ordinary and unskilled person, then the underground stream does not fall within the class of underground streams mentioned in the second division hereof. (4) That if the existence and course of the underground stream was not known before the underground work was done, and was only discovered after the underground work was done, that it does not fall within that class of underground streams mentioned in the second division hereof. (5) That all percolating waters belong to the owner of the soil in which they are found, and when the doing of underground work gathers these percolating waters they belong to the owner of the soil in which they are gathered. (6) That the presumption is that all the underground waters discovered by underground work are percolating waters and belong to the owner of the soil in which they are found. (7) That underground streams not flowing in well-defined channels and not having well-defined bed and banks, and whose existence was not open to the ordinary observer before the underground work is done, come within the

same rule as waters that are strictly percolating in the geological sense.

In support of these propositions, we cite the following authorities: Washburn on Easements (4 Ed.), p. 505, par. 2; Acton v. Blundell, 12 M. & W. 335; Chasemore v. Richards, 7 H. L. cases 349; Wheatley v. Baugh, 25 Pa. St. 528; Halderman v. Bruckhart, 45 Pa. St. 514; Williams v. Ladew, 161 Pa. St. 283; Trustees v. Youmans, 50 Barbour 316; s. c., 45 N. Y. 362; Roath v. Driscoll, 20 Conn. 533; Chatfield v. Wilson, 28 Vt. 49; Chase v. Silverton, 62 Me. 175; Ocean Grove, etc., v. Asbury, etc., 40 N. J. Eq. 447; Frazier v. Brown, 12 Ohio St. 294; Hanson v. McCue, 42 Cal. 303, 308; Mosier v. Caldwell, 7 Nev. 363; Taylor v. Welch, 6 Ore. 200; Deadwood etc., Co. v. Barker, 86 N. W. 619; Sullivan v. Mining Co., 11 Utah 438; Crescent Mfg. Co. v. Silver King Mfg. Co., 17 Utah 444; Willow Creek Co. v. Michaelson, 60 Pac. 943; Gould v. Eaton, 111 Cal. 639.

### STATEMENT OF FACTS.

This action was brought to enjoin defendants from taking water from certain wells excavated by them, which taking plaintiff claims cuts off a considerable amount of the source of supply of Grassy Trail creek, the water of which had theretofore been appropriated and used by plaintiff to irrigate about 150 acres of land; also to enjoin defendants from cutting off and diverting, by means of excavations, tunnels and drifts, the water from an underground channel or water course, which, it is alleged, supplied and fed certain springs, which it is claimed formed a part of the source of supply of Grassy Trail creek. The facts in the case are as follows: In 1878 the plaintiff took up certain arid lands in Carbon county, this State, and the following year appropriated and used thereon, for irrigating the same, all of the waters of Grassy Trail creek, and has ever since continued to so divert and use said waters when there was a sufficient quantity in the creek to flow down and onto his said land. When plaintiff first located on the stream in

1878 it was filled with beaver dams from the mouth to the head, whereby the water in several places was held back in large quantities, which tended to, and in fact did, to some extent, equalize the flow and conserve the water supply after the high water caused by the melting of the snow in the spring had subsided. In 1885 these beaver dams were torn loose and washed out by the freshets, and the channel of the creek thereby made deeper, extending down in the subsoil, which is composed of sand and gravel, into which the water sank thereafter to such an extent that during the hot summer months only a small portion of it reached plaintiff's land, there being barely sufficient to irrigate a small garden. During the low-water seasons of 1889, 1890, and 1899 the water in this creek sunk and disappeared entirely before it reached the head of plaintiff's ditch in which he conducted water from this creek onto his land. The principal source of supply for this creek during the low-water season was from two groups of springs which rose in the natural bed or channel of the stream. One group, the number of which is not given, rose about four miles up the creek from plaintiff's land, and the other, a group of eight, about two miles above, and where the creek passes through what is now the town of Sunnyside. The waters of this last-mentioned group, and those of a spring known as the "Icelander Spring," which is situated on the lower part of plaintiff's farm, are the only waters in controversy in this case, as the water from the upper group of springs, after the beaver dams were washed out, sunk before it reached Sunnyside, where the larger group of springs is situated. Plaintiff, in order to increase the supply of water for his farm, commenced in August, 1899, the construction of a pipe line from his land to the upper group of springs, which he completed in December of the same year, and through the pipe line conveyed the water from the upper springs to his ranch, and in September, 1900, he put in a branch line from the main pipe line to the lower group of springs, into which he took the water of six of them.

In 1899 the predecessors in interest of defendant Utah Fuel Company located and took possession of the lands on which the lower group of springs is situated, and commenced mining for coal, which they found in large quantities near the springs under consideration, and the following year (1900) the town of Sunnyside was built. The people of Sunnyside obtained their entire supply of water for culinary and domestic purposes from these springs. In February or March of 1900 defendants, in order to increase the supply of water at Sunnyside, dug a well about twenty-five feet in depth, and back about sixty-five feet from the edge of the creek where the upper spring is situated, and for several months pumped water therefrom, and then abandoned it, and excavated another a little higher up the channel, and back about ninety feet from the spring above mentioned, and from this last or new well, as it is designated in the record, pumped about 20,000 gallons of water daily. In the meantime the plaintiff dug a well about twelve feet deep, in the channel of the creek, just above defendant's first well. Plaintiff's well filled with water to within a few inches of the surface. About the time defendant Utah Fuel Company commenced pumping water from the new well the water in the upper spring, above mentioned, commenced failing, and soon thereafter ceased flowing entirely, and the spring has ever since remained dry. The record shows that the pumping of water from the new well did not affect or lower the water in the two abandoned wells which are situated between it and the spring.

The defendant Utah Fuel Company, in operating its coal mine at Sunnyside, ran a drift from the main part of the mine directly under the natural channel of the creek, and near the springs above mentioned, which arose therein. The face of this drift, or entry is eighty feet underneath the surface of the bed of the channel.

W. G. Sharp, one of the officers of defendant Utah Fuel Company, and who directed the running of this drift, testified in relation thereto in part as follows: "In

the face of the entry we encountered a crack and boulders and formations of sand. I saw indications that I was near some wash, not in bedrock of any kind, and I knew by our map that we were pretty near the old bed. of the creek, and I saw just such signs as would come from a wash at the bed of a creek., There was a crack in the formation leading up, and in that crack there was a little stream of water coming from above. . . . My impression is that there is wash from that point clear up: eighty feet of wash. . . . I knew the nature of this creek, and I knew the water sank in some places and came up again, and I knew there were surface springs opposite this drift. We built this without looking to see what effect it would have on the springs. Water came into that entry at the roof, and the coal and the floor. . . . We needed more water. When we started that drift we knew that we needed more water.''

H. G. Williams, general superintendent of the Utah Fuel Company, testified in part as follows: ''I did not have in mind that by striking off at that point we would get Mr. Whitmore's water. . . . As the mine developed, we needed more water. We knew Whitmore was claiming this creek, and knew there was some feeling or jealousy between Whitmore and ourselves in regard to the wells we had dug and the well he had dug. He was claiming the water, and we were claiming it, and we run deliberately towards this creek. We must have known at that time that the drift would run into and tap that water. Q. And when you got to what is now the face, what was the condition of the roof above? A. Well, in the extreme face, there is a crack in the roof. Q. There is a crack there where a stream of water comes down? A. Yes, sir. The water comes down; yes, sir.''

The learned judge before whom the cause was tried made a personal examination of Grassy Trail creek, including plaintiff's land, his pipe line, the spring and wells, also of the drift above mentioned, and in his oral

decision he says, referring to the drift: "I visited the north end of the level that was testified to, and I found that this level had run out of the coal and into the gravel, boulders and sand, indicating to me that it had struck the bottom of the creek. . . . At the end of this level I found an opening or cavity in the top where a considerable stream of water was flowing down into this level, coming from the rocks, sand and dirt above."

After this drift was run under the channel of the creek water ceased flowing from some of the springs, and in others it was reduced to mere seeps. The defendants dug another well near the creek, and about 2,000 feet below where the channel is tapped by the drift above mentioned. Plaintiff in his second cause of action alleges that the taking of water from this well by defendants has greatly diminished the flow of water from his Icelander spring, which, as before stated, is situated on the lower part of his farm, and about two miles from the well. The record shows that the water from this lower well is of a different character from that produced by the upper wells which supply Sunnyside. It also appears that there is a high ridge or hill between the lower well and the Icelander spring. The record also shows that the ten years next preceding the commencement of this action were unusually dry, the snow and rain fall during this period being much less than in former years, and that as a result of this protracted drouth there was less water in Grassy Trail creek than formerly.

The court found the issues relating to the alleged wrongful diversion of the water in controversy in favor of defendants, and dismissed the action. The findings of fact made and filed by the court in the first cause of action, so far as material here, are as follows:

"(13) That the said well [referring to the new upper well] is supplied by waters percolating through the soil under the surface thereof, and moving therein, without any definite channel, and in courses which are unknown and unascertainable; that the sinking of said

well intercepted water percolating in the soil under the surface of the ground, which, but for said well, would have reached said springs, and become a part thereof, by percolating through the soil to said springs; that the sinking of said well intercepted these percolating waters before they reached said spring, and collected them in said well, from which they were pumped for the supply of water for the inhabitants of Sunnyside, as aforesaid.''

"(16) That in the opening, development, and operation of the said coal mines water was encountered during the progress of the work therein, and water continues to come from the sides, floor, and roof of said mine. These waters are waters percolating through the soil, rock, and coal formations below the surface of the ground, without any definite channel, and in courses which are unknown and unascertainable, which, by the openings made by the removal of coal, are collected and find an outlet into said mine.

"(17) That the opening of the mines and the flow of the percolating waters into said mines do not in any way affect any of said springs.

"(18) That, except as hereinbefore stated, no work has been done by the Utah Fuel Company, or its predecessors in interest, by which any water has been developed, intercepted or diverted from its natural course, and no water that found its way to any of said springs, and formed a part of the flow thereof, and no water that formed a portion of the stream flowing in Grassy Trail creek, has been intercepted and cut off from reaching said springs or said creek bed, except the percolating waters that form the supply of water in what is known and described as the upper well used by said Utah Fuel Company to supply the inhabitants of Sunnyside with water for domestic purposes, and no water flowing from any of said springs or in said creek has been taken after it reached and became a part of any of said springs or streams flowing in said creek.''

Plaintiff appeals.

McCARTY, J., after stating the facts, delivered the opinion of the court.

Appellant contends that the upper spring was supplied and fed by water flowing through a defined underground channel or water course, and that the flow was intercepted and cut off by the digging of the two upper wells and the pumping of water therefrom by the defendants, and that the thirteenth finding of fact is erroneous. In support of this contention appellant relies mainly upon the fact that this spring went dry soon after defendants commenced pumping water from the wells above mentioned. This, however, is a coincidence that may be accounted for by the fact that about the time this spring commenced failing the water from the upper group of springs which had theretofore flowed down and sunk in the channel above the spring in question was turned into plaintiff's pipe line, thereby cutting off a part of the supply which, it is presumable at least, in part fed the underground flow which the record shows beyond any question existed in the channel and passed through Sunnyside. The cutting off of this supply and the protracted drouth which had prevailed in that part of the State for more than ten years may have and undoubtedly did to some extent affect the flow of water from this and the other springs in controversy. It is evident, however, that the tapping of the underground channel by the drift before mentioned had more to do with drying up the spring in question than all other agencies combined.

It is shown that the pumping of water from the new upper well had no effect whatever on the water standing in the old town well and the one excavated by Whitmore, which wells are situated much nearer the spring than the one from which the water was taken. This, together with the fact that for a period of four weeks during the months of August and September, 1901, no water was taken from either of the upper wells, and the spring still remained dry, tends strongly to support the contention of respondents that there was no connection

between the waters that supplied the wells and those that fed the spring.

The trial judge who heard the case not only had all these facts before him, but he made a personal examination of the several wells and the springs referred to, and fully understood the conditions as they existed there, and we are not prepared to say that the findings on this point are not supported by the evidence. In fact, we think that the preponderance of the evidence shows that the pumping of water from the upper wells did not deprive plaintiff of any water which he had theretofore appropriated.

We think the evidence conclusively shows that there is an underground or subterranean stream' of water which flows down the channel of Grassy Trail creek to Sunnyside, and which to a considerable extent fed the lower group of springs, the waters of which had for more than twenty years been appropriated and used by appellant on his farm. The testimony of Sharp wherein he says, referring to the water of this channel above Sunnyside, that he "knew the water sinks in some places and comes up again," when considered in connection with the observations made by the trial judge, as stated by him, in his oral decision, of the appearance and conditions of the face of the drift which was run underneath the bed of the creek, and the tapping there of a well-defined stream of water, leaves no doubt as to the existence of a subterranean flow. And the fact that the water from the springs in the channel immediately above this drift ceased flowing about the time the channel of the creek was intersected and cut by the drift is, at least, prima facie proof that the drying of the springs was due to the tapping by the defendants of the underground flow as above stated.

That known underground streams of water flowing in well-defined channels, such as the one under consideration is shown to be, are subject to appropriation,

26 Utah 32.

and that rights acquired in them by appropriation cannot be diverted by the wrongful act of another, is so well settled that we deem it unnecessary to enter upon a discussion of the question. Kinney on Irrigation, 44; Black's Pomeroy on Water Rights, 67.

Therefore it necessarily follows that plaintiff is entitled to recover from respondents whatever damages the evidence shows he has sustained which are the proximate and direct result of the diversion of the waters of the lower group of springs above referred to.

It appears from the record that the source of supply of water for Grassy Trail creek has been destroyed, and that it would be impossible for the defendants to return the water to plaintiff; hence he is entitled to recover whatever the evidence shows to be the value thereof.

We are of the opinion, and so hold, that the 16th, 17th, and 18th findings of fact are erroneous, and are not supported by the evidence.

On the issues raised by plaintiff's second cause of action, which involve the water taken by defendants from the lower well, the court found "that said well is supplied by waters percolating through the soil under the surface thereof, and moving therein without any definite channels, and in courses which are unknown and unascertainable, the waters supplying said well entering therein at a depth of sixty feet below the surface of the ground, and from the direction of a side canyon, opening into the canyon through which said Grassy Trail creek flows; that the sinking of said well and the taking of water therefrom by said Utah Fuel Company does not in any way affect any of the springs that flowed into the channel of said creek, nor the spring known as the 'Icelander Spring,' and did not diminish the flow in any of said springs." Appellant challenges the foregoing findings, and insists that they are not supported by the evidence, and contends that the lower well tapped the underground stream that had theretofore fed and supplied the Icelander spring. While the

evidence on this branch of the case is somewhat vague and unsatisfactory, yet it tends to show that the water, when the well was dug, came in on the side of the well next to and in the direction of a "side canyon," and not from the underground flow of Grassy Trail creek, and the only evidence from which it might be inferred that the taking of water from this lower well interferes with the flow of the spring is that at about the time the well was dug the spring, which is two miles distant, with a high ridge between it and the well, commenced to fail, but did not go entirely dry.

This court has repeatedly held that a finding of fact by a trial court will not be set aside unless it is clearly against the preponderance of the evidence. Henderson v. Adams, 15 Utah 30, 48 Pac. 398; McCornick v. Mangum, 20 Utah 17, 57 Pac. 428; Hannaman v. Karrick, 9 Utah 236, 33 Pac. 1039; Dooly Block v. Transit Co., 9 Utah 31, 33 Pac. 229, 24 L. R. A. 610; Whitesides v. Green, 13 Utah 341, 44 Pac. 1032, 57 Am. St. Rep. 740; Watson v. Mayberry, 15 Utah 265, 49 Pac. 479; Blish v. McCornick, 15 Utah 188, 49 Pac. 529; McKay v. Farr, 15 Utah 261, 49 Pac. 649; Dwyer v. Mfg. Co., 14 Utah 339, 47 Pac. 311; Short v. Pierce, 11 Utah 29, 39 Pac. 474.

The judgment of the trial court dismissing plaintiff's second cause of action is affirmed, but is reversed as to the first cause of action, and the cause is remanded, with directions to said court to enter judgment in favor of plaintiff for the damages which he has sustained by the diversion of the waters of the lower group of springs by the defendants; if, however, the court is unable to render judgment on the evidence introduced, to reopen the case for the taking of further testimony on this branch of the case.

Costs of this appeal to be taxed against respondents.

BASKIN, C. J., and BARTCH, J., concur.