CHANDLER, et al. v. UTAH COPPER CO., et al.

No. 2128.    Decided February 8, 1913.    Rehearing denied September
17, 1913 (135 Pac. 106).

1. WATERS AND WATER COURSES—UNDERGROUND STREAMS—EVIDENCE.
   Evidence *held* to show that an underground stream flowed in
   a well-defined natural channel and the water thereof was sub-
   ject to appropriation for beneficial uses.[1]    (Page 486.)

2. WATERS AND WATER COURSES—APPROPRIATION TO BENEFICIAL USE
   —VESTED RIGHTS.  Under Const. art. 17, sec. 1, providing that
   all existing rights to the use of any of the waters of this state
   for beneficial purposes are recognized and confirmed, an ap-
   propriator for a beneficial use of water from a natural stream
   acquires a vested right in the stream to the extent of his ap-
   propriation, and the right carries with it an interest in the
   stream to the source from which the supply is obtained.[2]
   (Page 487.)

3. WATERS AND WATER COURSES—APPROPRIATION OF WATER—PRO-
   CEEDINGS BEFORE STATE ENGINEER—JURISDICTION.  Comp. Laws
   1907, sec. 1288x5, providing for proceedings before the state
   engineer to appropriate water, but limiting the rights conferred
   to rights to the use of any unappropriated water in the state,
   limits the jurisdiction of the state engineer to unappropriated
   waters only, so that he may not entertain proceedings or make
   any order respecting any water rights already acquired, and
   a certificate to an appropriator may not prejudice the rights
   of a prior appropriator.  (Page 487.)

[1] Whitmore v. Utah Fuel Co., 26 Utah, 488, 73 Pac. 764.
[2] Cole v. Richards Irrigation Co., 27 Utah, 205, 75 Pac. 376, 101
Am. St. Rep. 962; Salt Lake City v. Water & Electric Power Co.,
24 Utah, 249, 67 Pac. 672, 61 L. R. A. 648.

4. WATERS AND WATER COURSES—DIVERSION OF WATER OF SUBTER-
RANEAN CHANNEL—EVIDENCE. Evidence *held* to show a diversion
by defendants of water from a subterranean channel appropriated
by plaintiff for irrigation purposes, justifying relief. (Page
488.)

5. WATERS AND WATER COURSES—DIVERSION—APPROPRIATION—EVI-
DENCE. Evidence *held* to show that plaintiff, appropriating
water in a subterranean channel, acquired the right to at least
225 gallons per minute, entitling him to restrain another from
reducing the volume of the water so as to interfere with his
rights. (Page 495.)

LEWIS, DISTRICT JUDGE, dissenting.

APPEAL from District Court, Third District; *Hon. C. W. Morse,* Judge.

Action by George E. Chandler and another against Utah Copper Company and another.

Judgment for defendants. Plaintiffs appeal.

REVERSED AND REMANDED.

*Dey & Hoppaugh* for appellants.

*Dickson, Ellis, Ellis & Schulder* for respondents

McCARTY, C. J.

This is an action in equity in which plaintiffs seek to enjoin defendant from diverting the water from a certain subterranean channel or water course in Bingham Canyon, Salt Lake County, Utah. From a judgment rendered and entered dismissing plaintiffs' complaint, this appeal is taken.

Plaintiffs are, and for twenty years have been, the owners of 2000 acres of arid land situate at or near the mouth of Bingham Canyon. This land comprises what is known as the Butcher ranch. Plaintiffs and their grantors, for about thirty-five years next preceding the commencement of this action, used the water of Bingham Creek, of which there is but a limited supply, to irrigate about 140 acres of the land

mentioned and for culinary purposes. In 1888 the Watson Mining Company, a corporation, was the owner of a portion of what is known as the Ireland and Watson placer mining claim, patented as United States lot 183, situate in Bingham Canyon, and was also the owner of certain other placer mining claims adjoining the Ireland and Watson placer claim.

The court's fourth finding of fact, which is fully supported by the evidence, is, so far as material here, as follows:

"That, while said Watson Mining Company was the owner of said (Ireland and Watson) placer mining claim, it caused to be run and constructed a certain tunnel about 3000 feet long, commonly known and called the Watson tunnel: said tunnel being run and made in what is known as Bingham Canyon, Salt Lake County, Utah. That in driving said tunnel said Watson Mining Company encountered water which flowed out of said tunnel. That thereafter, and in the year 1890, the said Watson Mining Company, then owner of a portion of said Ireland and Watson mining claim . . . and other adjoining placer mining claims, pursuant to the terms of a contract with the plaintiff above named, George E. Chandler, for good and valuable consideration, granted bargained, sold and conveyed unto said plaintiff George E. Chandler and to Charles W. Watson, now deceased, the husband of the said plaintiff Martha J. Watson, and to their heirs and assigns forever, all the waters and the use to all the waters then flowing from or which might thereafter flow from *or to be developed in or by said Watson tunnel, its branches and connections then existing or thereafter made.* (Italics ours.) The court further finds that in the year 1898 the said Watson Mining Company sold and conveyed to the said defendant West Mountain Placer Mining Company all its right, title, and interest in and to the said Ireland and Watson placer mining claims, also that certain placer mining claim known as the Scoville placer mining claim, together with various and other placer claims then and theretofore owned by said Watson Mining Company, situate near or adjacent to said above-mentioned patented claims; that the

43 Utah 31

said property so sold and conveyed included a portion of the property in which said Watson tunnel had been driven in or run and constructed. That said defendant West Mountain Placer Mining Company took and received said conveyance from said Watson Mining Company of said above-mentioned mining claims and property with notice of the conveyance by said Watson Mining Company to said plaintiff George E. Chandler and said Charles W. Watson of the waters developed and flowing through said Watson tunnel, as aforesaid."

The placer claims mentioned and referred to in the foregoing finding of facts extend from the mouth of the Watson tunnel westerly up and along Bingham Canyon and take in the entire bed of Bingham Creek for a distance of about 7000 feet. The bed of the creek where the same passes along and through these placer claims is composed of a thick layer of deposits of gravel and cement. The cement, which contains placer gold, lies near the bedrock underneath the gravel and from 100 to 130 feet below the surface of the creek bed. The Watson tunnel was constructed and used primarily as a drain tunnel to drain and draw off the percolating and underground flow of water from the cement and gravel deposits mentioned so that they could be successfully mined. In other words, to drain off the water so that the gravel might be brought to the surface through shafts and inclines and panned for gold. The tunnel was timbered with "common tunnel sets" or round timbers about six or eight inches in diameter and from six to six and one-half feet hight. These timbers were set upon sills and were capped with timbers about three and one-half feet long. These tunnel sets were placed about four feet apart, and the tops and sides thereof were lagged or lined with two-inch plank. The mouth of the tunnel is on a level with the surface of the bed of the creek, but owing to the gradual rise of the ground to the west up and along the creek bed, the tunnel gained depth in its course through and along the gravel which forms the bed of Bingham Canyon. About 2050 feet of the tunnel was constructed before any appreciable quantity of water was encountered. At that point, (2000 feet from the mouth) an incline extending from the

surface of the ground to the face of the tunnel was made, and the material thereafter taken from the tunnel as the work therein progressed was brought to the surface through the incline. When the tunnel was completed to a point 500 feet beyond the incline, the work on the face of the tunnel was temporarily suspended. In the 500 feet between the incline and the face of the tunnel considerable water was encountered and a box or flume made of redwood plank, was laid from the mouth of the tunnel to the incline to carry off this water. The dimensions of the inside of the box or flume was sixteen by sixteen inches. There seems to be some conflict in the evidence regarding the time when the flume was laid from the mouth of the tunnel to the incline. John Brooks, a witness called by defendants, testified that he was in the tunnel in the "early spring" of 1890 and cleaned out a portion of the box that was filled up with gravel and debris. Plaintiffs' evidence tended to show that the tunnel was flumed from the mouth to the incline in 1893. The time, however, when this was done is not of controlling importance. Soon after the box was laid, every alternate set of timbers in the tunnel was removed and the gravel from the top and sides of the tunnel was caved in on the box. In 1894 work extending the tunnel was resumed and a sufficient amount of water was developed therein to practically fill the flume. About this time a shaft known as the Butters shaft was sunk about 150 feet up the canyon from the present face of the tunnel. This shaft, which was sunk ten feet into the bedrock of Bingham Canyon, tapped the underground flow of water in question.

The shaft, as well as the extent of the underground flow of water at that point, is described by John Butters, one of the defendants' principal witnesses, as follows:

"I think we sunk into bedrock in the neighborhood of ten feet. . . . When we struck bedrock the water there had a current. We ran one drift from the shaft to the west or westerly. That drift was on bedrock. . . . The water coming out that drift practically kept the dirt washed away from the face all the time. It cleared the dirt that we would break down. . . . The water came in with force and

caused a spray and spurting through the rock and gravel.
. . . The object of these drifts was placer mining pur-
poses. In placer mining it is absolutely necessary to drain
bedrock. . . . We had a breast board to keep it from
forcing the gravel into the workings and letting the work
down on us. We pumped the water from that shaft. While
pumping at our shaft I think we drained some of the Watson
tunnel; quite certain it did. Our pump had some effect in
diminishing the water. I could not tell the extent. I know we
were pumping while they (plaintiffs) were putting in the
flume."

It is conceded that a "heavy" flow of water running in a
well-defined natural underground channel was encountered
in the sinking of this shaft. The defendants in their answer
allege:

"That said shaft (Butters shaft) encountered upon and
immediately overlaying said bedrock a heavy and consider-
able flow of water running in a well-defined channel."

Regarding the effect that the pumping of water from the
Butters shaft had on the flow of water in the tunnel, C. J.
Finnell, who worked in the tunnel at the time the pump in
the Butters shaft was in operation testified in part as fol-
lows:

"Just as soon as the Butters shaft started pumping, the
water in the tunnel began to get less and finally drained out
entirely. . . . I think the Butters shaft stopped pump-
ing in 1895. During the high-water season, after the pump-
ing was stopped in the Butters shaft, the tunnel flume would
be chock full of water and would come there with quite a lot
of force, and in the low-water season it would be nearly full.
. . . When I finished in 1895, in February, there was
no water coming out of the tunnel. Pumping at the Butters
shaft caused it to cease flowing."

David Wolfe, another witness for plaintiffs, testified that
he assisted in laying the box or flume from the incline within
fifty feet of the face of the tunnel. Regarding the flow of wa-
ter he said:

"We laid these boxes about a month before the Butters

pumping plant or shaft, where they were placer mining, shut down. The tunnel was then perfectly dry. I think at the time we had three or four boxes to lay before we got connected up. Then they shut down. The tunnel was perfectly dry at that time. . . . That was in the evening. The next morning before noon water came. The box was full. We could swim the otherboxes up to it. We had quite a hard time to get it connected up on account of the water. This was after the pumping had ceased in the Butters shaft. After the pump stopped the depth of the water was such that the boxes were about full. That is, the flume was full."

The tunnel was boxed to within fifty feet of its face. The fifty feet between the face of the tunnel and the intake of the flume was securely timbered and the top and sides boarded up, and the entire fifty feet of tunnel was bulkheaded with redwood ties or timbers the full height and width of the tunnel. These redwood timbers were piled in tiers one across another so that spaces were left for the water to run through and into the intake of the flume.

In 1898 the defendant West Mountain Placer Mining Company sank what is known as the West Mountain shaft. This shaft is on the same side of Bingham Creek as the Butters shaft and 2800 feet farther up Bingham Canyon. About this time another shaft was sunk on the opposite side of the creek and about 200 feet from the West Mountain shaft. Both of these shafts were sunk several feet below bedrock. A crosscut or tunnel was made in the bedrock connecting these shafts. Two upraises, one eighteen and the other twenty-three feet in height, were made from the crosscut into the gravel bed of the creek. In mining this ground extensive underground excavations leading from the upraises into the gravel were made. In making these upraises and excavations a large "amount of water," as found by the court, "was encountered." This water was drained into the crosscut and from there flowed into the shaft, through which it was pumped to the surface. Some time in 1900 placer mining at this particular place was abandoned and the pumps in the shaft remained idle until 1904, when the defendant Utah

Copper Company commenced the pumping operations here complained of and out of which this controversy arose.

Regarding the character of the underground flow of water in the bed of Bingham Creek where the same is tapped by the upraises and excavations mentioned, D. C. Jackling, vice-president and business manager of the defendant Utah Copper Company, testified in part as follows:

"The water comes in the shaft in a stream through a lateral connecting with the shaft and also with an upraise through the bedrock and bottom of the canyon in the gravel. From my general experience as a mining engineer and examination of this shaft and the physical conditions surrounding the inflow of water to the shaft, I think the water that flows into that shaft is the water of the underground natural channel."

Daniel H. Ferguson, another witness for defendants, testified on this point as follows:

"We had a stream of water there that would knock a man down when I broke into the main channel. The first thing that was done was to sink a shaft into the rim rock with the calculation of draining the ground. We drove a drift out from the bottom, and we were lower than the main channel of the creek there. We raised from there up into what we called the main channel and when we struck out of the channel into the gravel we got this body of water."

It is clearly established by the record that the underground stream of water in the creek bed flows in a well-defined natural channel and was subject to appropriation at the time the Watson tunnel was constructed. (*Whitmore v. Utah Fuel Co.,* 26 Utah, 488, 73 Pac. 764.) The defendant Utah Copper Company, proceeding upon this theory on December 21, 1904, made application to the state engineer of the State of Utah to appropriate and use all the water which might thereafter be pumped from the West Mountain shaft for general milling purposes and for generating steam. After a hearing was had on the application as provided by law, the state engineer issued a certificate to the defendant Utah Copper Company in accordance with the appli-

cation. The certificate recites that the uses therein specified "will consume all the water pumped from the shaft."

It is a well-recognized principle of law in this arid region that, when the waters of a natural stream have been appropriated according to law and the waters put to a beneficial use, the appropriator acquires a vested **2** right in the stream to the extent of his appropriation, and such right carries with it an interest in the stream to the source from which the supply is obtained. In fact, article 17, section 1, of the Constitution, provides that "all existing rights to the use of any of the waters of this state for beneficial purposes are hereby recognized and confirmed."

Questions arising under this constitutional provision were involved and considered in the case of *Cole v. Richards Irr. Co.*, 27 Utah, 205, 75 Pac. 376, 101 Am. St. Rep. 962. In the case of *Salt Lake City v. Wat. & Elec. P. Co.*, 24 Utah, 249, 67 Pac. 672, 61 L. R. A. 648, this court speaking through Mr. Justice Bartch, said:

"Prior appropriators have vested rights in the use of the water appropriated by them with which no court is warranted to interfere, or to permit subsequent appropriators to do so."

The law providing for proceedings before the state engineer to appropriate water expressly limits the rights conferred by such law or statute to "rights to the use of any of the *unappropriated* water in the state." (Comp. Laws 1907, section 1288x5.) The act does not au- **3** thorize, nor purport to authorize, the state engineer to entertain proceedings or to make any order respecting any water rights already acquired. His jurisdiction in such matters is limited to unappropriated waters only. It therefore necessarily follows that the certificate issued to the Utah Copper Company did not and could not, to the prejudice of plaintiffs' prior rights therein acquired, confer upon the company the right to divert any water from the underground channel from which the Watson tunnel is supplied.

The court found that the pumping operations carried on by the defendant Utah Copper Company at the West Moun-

tain shaft "has not in any way whatever interfered with or affected the said Watson tunnel, or diminished or in any way affected the flow of water from said tunnel, **4** and has not diminished or destroyed any water developed in or by said tunnel, or caused any water which theretofore flowed therefrom to cease to flow therefrom." The court further found that "said water so pumped from said shaft . . . was not in any way connected with the said water flowing from said Watson tunnel, and that the pumping thereof and use thereof by said defendants as hereinbefore found have not in any way interfered with the use of said plaintiffs, or either of them, or said Charles W. Watson, with any of the waters which at any time were developed by or flowed out of the Watson tunnel." As a conclusion of law the court found: "That said plaintiffs are not, nor is either of them, the owner of or entitled to the use of any of the waters found in or pumped from the said West Mountain shaft in the foregoing findings mentioned and referred to, which have been heretofore pumped therefrom by either said defendant West Mountain Placer Mining Company or said defendant Utah Copper Company, or which may hereafter be pumped from said shaft by either of said defendants or their successors or assigns." This conclusion of law and the findings of fact last referred to are assigned as error.

It is contended by appellants, and we think the contention well founded, that these findings are not only contrary to the great weight of the evidence but are also unsupported by evidence. Some of defendants' witnesses expressed opinions that the underground stream of water tapped by the West Mountain shaft is not the same stream that supplied the Watson tunnel. These opinions, we think, are not supported by any fact or facts in the case. The evidence without conflict shows that the lay and grade of the bed of Bingham Creek with reference to the elevation and general contour of the country on either side thereof and adjacent to Bingham Canyon are such that the underground stream of water tapped by the West Mountain shaft, if not diverted from its

CHANDLER v. UTAH COPPER CO.

natural channel by artificial means, must of necessity flow on down in the bed of Bingham Canyon where the Watson tunnel is situated. In fact, it is the only course the water when not interfered with can take. Mr. Jackling, vice president and general manager of defendant Utah Copper Company on cross-examination testified in part as follows:

"Q. Now, this water which you pumped, which you call your water, if you did not pump it, where would it go? A. Proceed on down the canyon in its channel in bedrock. . . . . Q. The water if not pumped goes down the natural channel? A. Yes, sir; must. Q. Is that natural channel different from the surface stream? A. The only difference, one is underground and one is on the surface."

Therefore the important question presented by this appeal is:

Do the pumping operations of the defendant Utah Copper Company at the West Mountain shaft materially interfere with and invade the prior vested rights acquired by plaintiffs to the waters flowing in the underground channel which were intercepted by and which flowed out of the Watson tunnel, and, if so, to what extent? Upon a careful examination and consideration of the voluminous record in this case containing more than 1000 pages of testimony and elaborate maps and numerous other exhibits, we are satisfied that the only inference that can reasonably be drawn is that the pumping operations of the Utah Copper Company at the West Mountain shaft reduce the level of the water in the underground channel to such an extent as to practically dry the tunnel. The evidence without substantial conflict shows that from 1895 until 1898 there was a substantial flow of water from the tunnel; that in the fall of 1898 the defendant West Mountain Placer Mining Company commenced pumping water from the West Mountain shaft and immediately thereafter the water ceased flowing from the tunnel, and it remained practically dry until the fall of 1900, at which time the pumping operations at the shaft were suspended and water again flowed from the tunnel. On this point plaintiff Chandler testified as follows:

"After the pumping operations commenced by the West. Mountain Placer Company in 1898, we had no flow of water after they had pumped a short time. The flow of water came back in a short time when they ceased in 1900. . . . After the West Mountain ceased pumping, the flow of water through this flume in the tunnel came back to about the same quantity. Same as it had been before the next trouble (was) when the Utah Copper Company commenced pumping. That was in 1904."

David Wolfe testified:

"The effect of the operations of the West Mountain Company some time about 1898 to 1900 upon the flow of water through the flume in the Watson tunnel was to dry it up, and there was none. After the West Mountain operations ceased I saw water come out of there again and it looked about the same as it did before. In the years after the discontinuance of the West Mountain operations I went up there at different times and about as frequently as before . . . . and saw water coming out." On cross-examination he testified: "While I was working in the West Mountain pump shaft during their operations I saw there wasn't any water in the tunnel."

C. J. Davis testified that he was at the mouth of the tunnel several times in 1902 and that on each occasion he saw water flowing from the tunnel.

C. H. Davis testified that he was interested in the West Mountain Placer Mining Company, one of the defendants herein, up until 1901; that he worked in the West Mountain shaft and was familiar with the Watson tunnel; that "the water in the West Mountain shaft is certainly the same water that is in the drain tunnel, but it is not on bedrock any of it." "Q. Mr. Davis, did you observe when the West Mountain Company was pumping water in 1900 or 1899 whether or not it affected the flow of water out of the Watson tunnel? A. Why it certainly did while we were pumping there."

Woodhouse testified in part as follows:

"During the years 1900 and 1903 I was running the Watson and Chandler ranch (Butcher ranch) located at the

mouth of Bingham canyon. I resided there during that period. I knew the Watson tunnel while there. . . . During all the years I was there water came out of the tunnel. I never saw it dry. I had occasion during my stay there to observe the water come out of the tunnel at least once a week. At times I passed there every day during the summer season. I saw this tunnel water in connection with the creek water. . . . I cannot give the quantity of water in gallons or in feet that came out of that tunnel, but we considered we got about two-thirds of an irrigation stream in the high water. It may have decreased a little as the irrigation season advanced. . . . I am referring to the water that came from the tunnel. I never saw it dry. It was running whenever I saw it."

As we have stated, the record shows that from 1900 until some time in 1904 no water was pumped from the West Mountain shaft. And it is conceded that, during the pumping operations of the defendant Utah Copper Company here complained of, no appreciable amount of water flowed from the tunnel, and especially has this been the case in the low-water season, which in that particular section comprises the months of June, July, and August. But respondents earnestly contend that the drying up of the tunnel was and is due to causes other than the pumping operations carried on at the West Mountain shaft. They insist that the flow of water from the tunnel ceased because the box or flume became decayed, crushed, and filled up with sand and debris to such an extent that water could not flow through it. In support of this theory they called several witnesses who testified that the water ceased flowing from the tunnel in 1901. Other witnesses for the defendant fix a much more recent date as the time when the water ceased flowing. R. C. Gemmel, who is the general superintendent of defendant Utah Copper Company, testified in part as follows:

"First time I ever saw the mouth of the Watson tunnel was May of last year (1907). . . . I was at the mouth of the Watson tunnel in May and the water was bubbling up. Don't know where that water came from."

And again he says:

"I have seen the mouth of the Watson drain tunnel and the new box (referring to a section or two that were put in at the mouth of the tunnel) that has recently been installed there in the past year and a half. When I saw the water coming out of the tunnel, a portion was running in the box and a portion bubbling up from below."

J. W. Mitchell, another of defendants' witnesses, testified that since 1892 he has resided in close proximity of the Watson tunnel; that the water from the tunnel "since 1894 has rapidly decreased up until the last year there has not been any to speak of; that is, in midsummer. . . ." "Q. Now the water, then, would come out of the tunnel and bubble up sort of, would it, in the creek? A. Yes, it did. That is, two or three years past, last year or two years, why, it has been. . . . The water in the spring of the year ran out in about the same course it did years ago."

This evidence, instead of disproving or weakening, rather supports plaintiffs' theory that the pumping operations of the Utah Copper Company at the West Mountain shaft materially affects the flow of the water from the Watson tunnel.

Respondents in their brief say, and we think the evidence fairly supports the statement, that the Watson tunnel is at least thirty or forty feet above bedrock. Again they say:

"It is conclusively settled by witnesses for plaintiffs and defendants . . . that in the sinking of the Butters shaft the first water was struck thirty-five or forty feet above bedrock." And further: "It is conceded that the pumping of water from the Butters shaft would take away at least a portion of the water of the drain tunnel."

The evidence without conflict shows that there is much more water in the underground tunnel in the spring or high-water season than there is during the summer or low-water season. The face of the tunnel being near the water level of the subterranean channel, the flow of water into the intake of the tunnel would be more or less affected by the pumping of water from the West Mountain shaft, which, we think,

the evidence all but conclusively shows is connected with the main underground channel. And it necessarily follows that the effect on the flow of water from the tunnel would be much greater in the low-water season than it would be in the high-water season, which no doubt accounts for the water flowing from the tunnel in the spring and failing to flow therefrom during the months of June, July, August, and September.

During the progress of this trial in the lower court the defendants, for the purpose of demonstrating that the pumping operations have no effect on the flow of water from the tunnel, closed down their pumps at the West Mountain shaft for a period of forty-eight hours, and they introduced evidence tending to show that neither during the time the pumps remained idle nor thereafter did any water flow from the tunnel. They earnestly contend that this conclusively demonstrates that there is no connection between the flow of water in the underground channel at the West Mountain shaft and the flow at the intake of the Watson tunnel, or that the box or flume in the tunnel has become decayed, crushed, and filled up so that water can no longer flow through it, and that in either case plaintiffs are precluded from recovering in this action. We do not think this test, if it can be called a test, when considered, as it must be, in connection with other evidence in the case, proves or demonstrates anything. As we have pointed out, the Butters shaft is about 150 feet from the face of the tunnel; that certain pumping operations, herein referred to, carried on at the Butters shaft dried the tunnel; that when the pumping at the shaft ceased it required anywhere from twelve to fifteen hours for the water to reach the intake of the tunnel. David Wolfe testified on this point as follows: "They shut down. That was in the evening. The next morning before noon the water came." This evidence, which is not disputed, shows that it required at least twelve hours for the water in this underground channel to flow 150 feet. The evidence also shows, in fact it is conceded, that the bed of Bingham Canyon has practically a

uniform grade from the intake of the Watson tunnel to the West Mountain shaft, a distance of about 2950 feet, and that the soil and gravel in the creek bed between these two points is of the same general character. Therefore the only reasonable inference that can be drawn from these facts is that the velocity of the water is no less uniform than is the grade of the bed of the canyon and the character of the gravel through which it flows. This being so, it would require nearly ten days from the time pumping is discontinued at the West Mountain shaft for the water which had theretofore been diverted through the shaft to reach the intake of the tunnel.

D. C. Jackling, vice president and business manager of the defendant Utah Copper Company, evidently was of the opinion that the tests made were wholly inadequate to demonstrate what effect, if any, the pumping operations in question had on the flow of water from the Watson tunnel, because in his testimony he says:

"I should say if the conditions remained absolutely normal with respect to the amount of water flowing down Bingham Creek throughout the time that the pump was run, and throughout the time it was stopped, would determine whether or not the operations had any influence. We have had no opportunities to determine it in that way. We are operating our property constantly."

There is some evidence in the record from which it might be inferred that the flume in the tunnel, in places, is crushed and stopped up. Conceding this to be the fact, still the judgment in this case cannot be upheld. As we have pointed out, the evidence shows that the intake of the flume is but a little lower than the water level of the underground channel. Therefore the diversion of any considerable amount of water from the stream higher up the creek must of necessity dry the tunnel. This was thoroughly and conclusively demonstrated by the pumping operations carried on at the Butters shaft. Under the decree in this case the defendants are authorized to pump and take through the West Mountain shaft the entire underground stream in question and are not re-

quired to return any part of it into the Bingham Creek so that it can be utilized by plaintiffs on their ranch. Therefore, even though plaintiffs should repair the flume, assuming for the sake of argument that it is out of repair, they would not under the decree in this case be legally entitled to any of the waters of this underground stream heretofore appropriated by them.

The evidence regarding the amount of water that plaintiffs are entitled to have flow into the intake of the flume is not as clear as it might be, but the evidence introduced by defendants on this point shows that the normal flow from the tunnel prior to 1896 when the underground stream from which it was supplied was not interfered with by pumping operations at the Watson mine was at least 225 gallons per minute, or approximately one-half second foot. We are clearly of the opinion that the defendants have no right to pump water from the West Mountain shaft, or at any other point on Bingham Creek where such pumping would materially reduce the volume of water in the underground channel at the intake of the Watson tunnel, unless they first made provision to turn into Bingham Creek a quantity of water equivalent to a flow of 225 gallons per minute at the mouth of the tunnel.

The judgment is reversed, and the cause remanded to the trial court, with directions to set aside and vacate its findings and conclusions of law made and filed in the case in so far as they are in conflict with the views herein expressed, and to make findings and conclusions of law in accordance with this opinion. Costs to be taxed against respondents.

STRAUP, J., concurs. LEWIS, District Judge, dissents.